IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| MARIE BERNADETTE MURPHY, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| CAROLYN W. COLVIN, | : |
| Acting Commissioner, | : |
| Social Security Administration, | : |
| | : |
| Defendant. | : |

Action No. 2:15-cv-378

## REPORT AND RECOMMENDATION

This matter is before the Court on Plaintiff Marie Bernadette Murphy's ("Ms. Murphy") complaint filed pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Defendant, the Acting Commissioner of the Social Security Administration ("Acting Commissioner"), denying Ms. Murphy's claim for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act. Both parties have filed motions for summary judgment, ECF Nos. 12 and 14, which are now ready for recommended disposition. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Ms. Murphy's Motion for Summary Judgment, ECF No. 12, be **DENIED**; the Defendant's Motion

1

for Summary Judgment, ECF No. 14, be **GRANTED**; and the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

On December 9, 2011, Ms. Murphy initially filed her application for DIB, alleging disability due to chronic pain/myofascial pain, cervicalgia, degenerative disc disease, panic attacks, anxiety, and depression with an onset date of October 9, 2011. R. 155-58.[1] To qualify for DIB, Ms. Murphy was required to have insurance coverage at the time of her disability onset. 42 U.S.C. § 423(a); 20 C.F.R. §§ 404.101(a), 404.131(a). Ms. Murphy's date last insured ("DLI") is June 30, 2012. R. 15. Accordingly, Ms. Murphy has the burden of establishing the existence of a disability on or before that date.

Her application was initially denied on March 19, 2012, *id.* at 101-05, and again denied upon reconsideration on January 7, 2013, *id.* at 110-16. Ms. Murphy then requested a hearing in front of an administrative law judge ("ALJ"), which was conducted on December 10, 2013. *Id.* at 34-71. The ALJ, Judge William T. Vest, issued a decision denying Ms. Murphy's DIB application on February 6, 2014. *Id.* at 10-27. On April 9, 2014, Ms. Murphy filed a request with the Appeals Council to reconsider Judge Vest's decision. *Id.* at 7-9. On June 25, 2015, the Appeals Council denied Ms. Murphy's request for review, making the ALJ's decision the Commissioner's final decision. *Id.* at 1-6.

Having exhausted her administrative remedies, Ms. Murphy filed the instant complaint for judicial review of the Acting Commissioner's decision on August 25, 2015. ECF No. 1. The

---

[1] "R." refers to the certified administrative record that was filed under seal on October 30, 2015, pursuant to Local Civil Rules 5(B) and 7(C)(1).

Acting Commissioner filed an Answer on October 30, 2015. ECF No. 5. The matter was referred to the undersigned U.S. Magistrate Judge on December 3, 2015. ECF No. 7.

Ms. Murphy filed her Motion for Summary Judgment with a Memorandum in Support on December 30, 2015, ECF Nos. 12 and 13, and the Acting Commissioner filed a Cross-Motion for Summary Judgment and a Memorandum in Support on February 3, 2016, ECF Nos. 14 and 15. On February 16, 2016, Ms. Murphy filed a reply brief in support of her own motion for summary judgment and in opposition to the Acting Commissioner's motion. ECF No. 16.

## II. RELEVANT FACTUAL BACKGROUND

In her application, Ms. Murphy alleged a disability onset date of October 9, 2011, R. 155-58, with a DLI of June 30, 2012, *id.* at 15. As of her DLI, Ms. Murphy was a forty-one-year-old female who graduated from high school and completed two years of college. *Id.* at 194. Ms. Murphy previously worked as a school bus driver and a coordinator for Lake Tale Hospital. *Id.* at 38. At Lake Tale Hospital, Ms. Murphy coordinated the receipt and distribution of supplies for the hospital. *Id.* At the administrative hearing on December 10, 2013, Ms. Murphy provided the following testimony:

Ms. Murphy testified that as a hospital administrator, she was seated for approximately five hours per work day. *Id.* at 39. She further testified that on "heavy" days where she had to process high levels of inventory, she "would be doing things like checking inventory, product, things like that," and that as time passed she became unable to bend, pull, or pick anything up. *Id.* Ms. Murphy testified that she ceased her employment as a bus driver both because "of the lumbar problems . . . three bulging discs that started to become herniated . . . caus[ing] [her] SI joint to be affected. And also [her] sciatic nerve is being pinched, which causes severe pain in

[her] lower back . . . run[ning] down [her] right leg to the point [she] can't stand, or sit up" and because of a "nervous breakdown" following her mother's death in August 2007. *Id.* at 40. Additionally, Ms. Murphy testified that she stopped working because her oldest son also had a "nervous breakdown" at that time and was unable to attend school for a year. *Id.*

At the hearing, Ms. Murphy testified as to her current condition. Specifically, she said that she had no use of her left arm or left hand due to a "pinched nerve in the left side of [her] neck." *Id.* at 42-43. Ms. Murphy also testified that she experienced difficulty with medication previously prescribed to her for this condition, culminating in a visit to Maryview Medical Center Emergency Room on November 22, 2013. *Id.* at 43. Ms. Murphy testified that she sought emergency room treatment because her "stomach was so severely upset [that she] wasn't able to go to the bathroom and have bowel movements . . . and then with the medication mix up [she] just, [she] just lost it and just went right back to a nervous breakdown." *Id.* Later, she testified that she had run out of her pain medication and explained that she went to the Maryview Psychiatric Unit "for detox and to get control of [her] body and [her] mind." *Id.* at 45-46.

In addition to pain stemming from a pinched nerve in the left side of her neck, Ms. Murphy also testified that she was being treated for anxiety and depression, suffers from crying spells, panic attacks, "OCD," blurry vision, "fungus and bacterial infections of the ears," and "problem[s]" with her back, left foot, right leg, and knee. *Id.* at 46, 50, 54-55. Specifically, Ms. Murphy stated that she experienced ongoing pain in her left foot after stepping in glass in 2008, despite having undergone seven foot surgeries. *Id.* at 50, 52. Referencing her right leg, Ms. Murphy testified that "a three disc problem" in her lumbar spine caused "pinching [on her] sciatic nerve on [her] right side which cause[d] severe pain and problems with [her] right leg." *Id.* at 52. Ms. Murphy also stated that she had torn meniscus cartilage in her knee, but did not

4

specify which knee. *Id.* When asked how far she could walk without a problem, Ms. Murphy

responded, "I don't know the distance. I mean, it's hard for me to walk in my own apartment."

*Id.* at 50.

Ms. Murphy also testified as to her current treatment and explained that her current

medication regimen "doesn't include . . . pain medications . . . [b]ecause, they don't want to put

[her] on anything that's addictive." *Id.* at 46. Ms. Murphy testified that she currently takes

Neurotin, Ibuprofen or Naproxen, Cymbalta, Pepcid AC, and blood pressure medication. *Id.* at

46-47.

When asked what she did all day, Ms. Murphy responded, "Lay in my bed." *Id.* at 48.

She explained, "It's very difficult for me to sit in my living room because of my back. It's hard

to sit upright." *Id.* Then, she stated that she "get[s] [her]self out of bed about 15 minutes before

it's time to drive [her son] less than a ½ a mile to school." *Id.* Ms. Murphy explained that she

drives her oldest son to school every day and then takes her youngest son to the library to meet

his teacher at 3:30 p.m. *Id.* at 51-52. Between these two activities, Ms. Murphy stated that she

returns home and lies in bed. *Id.* at 49. She testified that she is unable to grocery shop because

"It's become too, too hard to walk and to stand and with [her] left arm like it is, [she] can't really

push the basket," and that her husband does the grocery shopping, housekeeping, and laundry.

*Id.* She also stated that she cannot bathe herself or dress herself unassisted, and stated, "[I]f I

tried to do anything it puts me literally flat on my back for two to three days. So I don't even try

anymore." *Id.*

Ms. Murphy's husband, Michael Murphy ("Mr. Murphy"), also testified. *Id.* at 62.

When asked about his wife's medication regimen in 2013, Mr. Murphy stated,

> She was under the care of Pain Management at that time. And, she had – and they
> had her on some heavy doses of pain medicine. And it ran short and she had a

> panic attack. And so we carried her to the hospital to see what they could do on getting her – well, what was going on. At the same time they found she was impacted, within her intestines, with her bowels and problems.

*Id.* Mr. Murphy confirmed that his wife drives their oldest son to school in the morning, returns home, and lies back down. *Id.* at 63. Mr. Murphy testified that he does "all the grocery shopping . . . any kind of lifting, pulling, pushing, type stuff." *Id.* at 64. Mr. Murphy confirmed that his wife has "two or three" panic attacks and crying spells a day at times. *Id.* Mr. Murphy also testified that his wife's medical problems have been ongoing for the "last couple of years." *Id.*

According to her medical records, Ms. Murphy was forty years old at her disability onset date on October 9, 2011. *Id.* at 72. Ms. Murphy's medical treatment began with an MRI of her lumbar spine on May 28, 2010, after she complained of lower back pain with right sciatica. *Id.* at 560-62. The scan revealed disc protrusion and bulges at multiple levels. *Id.* The most pronounced protrusion was at L4-5, and the radiologist observed that the protrusion appeared to have slightly increased compared to the previous study. *Id.* at 561. However, there was no evidence of significant stenosis. *Id.* Ms. Murphy sought treatment in July 2010 for ongoing pain in her left foot after stepping in glass, depression with anxiety, chronic pain in her left foot, back, both hips, and shoulders, and elevated blood pressure. *Id.* at 602. At that time, Ms. Murphy was diagnosed with depression with anxiety and chronic pain. *Id.* On October 9, 2010, Ms. Murphy underwent an MRI of her cervical spine, identifying no disc herniation, stenosis, or abnormal enhancement of the spinal cord. *Id.* at 372.

On May 3, 2011, Ms. Murphy presented to Patient First – Taylor Road, complaining of sinus congestion, cough, and a sore through with no relief from the use of over-the-counter medications. *Id.* at 806. She requested stronger narcotic medications for a headache, but was

6

declined by the treating physician. *Id.*

On May 5, 2011, Ms. Murphy presented to Mark Kerner, M.D. ("Dr. Kerner"), at Virginia Orthopedic & Spine Specialists ("VOSS") with complaints of a snapping sensation in her neck, leaving her with severe neck and radiating left arm pain with a burning numbness in her left arm. *Id.* at 557. Dr. Kerner noted that Ms. Murphy was in "significant" pain, and observed that she was "almost in tears," she had "antalgic" (pain-avoidant) range of motion of her neck. *Id.* Dr. Kerner examined a CAT scan and bone scan as both benign and did not believe that there was any "true" bony pathology in Ms. Murphy's neck. *Id.* at 558. Dr. Kerner ordered a repeat MRI of Ms. Murphy's cervical spine due to Ms. Murphy's "statements of progressive pain." *Id.* On May 31, 2011, Dr. Kerner assessed the MRI: The scan demonstrated migratory edema within the vertebral bodies, but no evidence of infection or other pathology. *Id.* at 556. Dr. Kerner concluded that there was "nothing surgical" in Ms. Murphy's neck. *Id.* Ms. Murphy returned on June 20, 2011 for Dr. Kerner to review a CAT scan of Ms. Murphy's neck. *Id.* at 555. In a progress note, Dr. Kerner recorded the following: "I have not been able to objectify the source of this pain. Her swallowing studies are normal. Her blood work is normal. The CAT scan . . . demonstrated no soft tissue injury in the neck. It does mention abnormalities in the chest." *Id.* He then concluded that there was "nothing with regards to [Ms. Murphy's] cervical spine . . . that explains her symptomatology." *Id.*

On September 2, 2011, Ms. Murphy visited Donald Holzer, M.D. ("Dr. Holzer"), at the Bon Secours Neuroscience Center for Pain Management ("Center for Pain Management") complaining that her Oxycodone prescription was losing its efficacy. *Id.* at 415-20. Ms. Murphy reported that she was experiencing the "worst pain ever," a 10/10 on the comparative pain scale. *Id.* at 417. Ms. Murphy also exhibited tenderness with a decreased range of motion in her

shoulders, elbows, wrists, and lumbar spine. *Id.* at 416. Dr. Holzer discontinued Ms. Murphy's Oxycodone prescription and prescribed Hydromorphone. *Id.* at 417. Upon follow-up on October 19, 2011, Ms. Murphy reported 40% to 50% pain relief, but had resumed taking Oxycodone five times daily. *Id.* at 410-11.

On November 15, 2011, Ms. Murphy returned to VOSS and presented to Lisa Blount, F.N.P.-C., complaining that she was losing strength in her left arm. *Id.* at 554. Ms. Murphy stated that she was dropping things with her left hand, and that the pain was starting to progress to her right side. *Id.* However, she demonstrated 4/5 strength of her bilateral deltoids, biceps, and triceps. *Id.* She had 5/5 in her grips and intrinsics. *Id.* A repeat MRI of Ms. Murphy's cervical spine showed normal alignment of the cervical spine with vertebral bodies maintained. *Id.* at 920. The scan also revealed an abnormal signal involving the C3-C5 vertebral bodies; mild disc osteophyte complex and facet arthropathy resulting in mild left foraminal narrowing at C3-C4; and disc osteophyte complex prominent on the left and left facet arthropathy resulting in mild left foraminal narrowing at C4-C5. *Id.* The radiologist's impressions explaining Ms. Murphy's results included post-traumatic response, migratory osteoporosis, and, less likely, metastatic disease, though the radiologist did not exclude this diagnosis. *Id.*

During a December 15, 2011, visit to the Center for Pain Management, Melissa McCrary, P.A. ("P.A. McCrary"), noted that she refused Ms. Murphy's request to increase her Oxycodone prescription. *Id.* at 403.

On January 13, 2012, Ms. Murphy returned to the Center for Pain Management and saw Charlotte Kirkman, L.P.N ("L.P.N. Kirkman"). *Id.* at 395-401. Upon examination, L.P.N. Kirkman found Ms. Murphy's neck supple and that she exhibited a normal range of motion. *Id.* at 397. Though she reported 50-60% relief of her pain with medication, Ms. Murphy requested

an increase in her regimen of Oxycodone, Sonata, and Klonopin. *Id.* at 395-96. Ms. Murphy reported that she spent her day caring for her two autistic sons (ages seven and thirteen). *Id.* at 395.

Ms. Murphy followed up with P.A. McCrary on January 25, 2012, complaining of generalized body aches. *Id.* at 388-94. On examination, Ms. Murphy had decreased left arm strength. *Id.* at 388. She reported about 20% pain relief with the same medication regimen and wanted to keep the same regimen. *Id.* P.A. McCrary continued Ms. Murphy's medication and instructed her to return in two months. *Id.* at 390. Upon follow up with P.A. McCrary on March 12 and May 18, 2012, Ms. Murphy reported that the medication continued to relieve her pain. *Id.* at 569, 571.

On January 30, 2012, Ms. Murphy returned to VOSS to follow up with Theresa Jackson, M.D. ("Dr. Jackson"). *Id.* at 552-53. Dr. Jackson noted that Ms. Murphy appeared to have no severe neural foraminal narrowing, despite the very mild degenerative changes at the C3-4 and C4-5 levels noted on the MRI. *Id.* at 552. Dr. Jackson felt that Ms. Murphy had a significant myofascial component to her pain, and offered trigger point injections. *Id.* Ms. Murphy declined the injections because she needed to return home to take care of her children. *Id.* Dr. Jackson ordered a home exercise program and instructed her to follow up. *Id.*

Ms. Murphy ultimately underwent the recommended trigger point injections on May 25, 2012. *Id.* at 816-17. Dr. Jackson administered the injections and noted that Ms. Murphy's cervical MRI continued to reveal only mild degenerative changes. *Id.* at 816. Dr. Jackson declined Ms. Murphy's request for additional pain medication, informing her that she should receive all of her pain medication from the Center for Pain Management. *Id.*

On July 6, 2012, Ms. Murphy presented to Patient First – Taylor Road for swelling and

pain in her ears. *Id.* at 900. Ms. Murphy noted that she takes two oxycodone pills five times per day. *Id.*

On July 18, 2012, Ms. Murphy returned to Dr. Holzer at the Center for Pain Management. *Id.* at 665. Ms. Murphy continued to complain of severe constant pain on the left side of the neck, left arm, left shoulder blade, low lumbar, and right leg with extension to the bottom of the left foot, both hands, and wrists. *Id.* She also presented with various oozing facial lesions for which she saw a dermatologist. *Id.* at 666. Dr. Holzer reported that though Ms. Murphy's current pain medication regimen reasonably controlled her pain, she felt the need for breakthrough medication. *Id.* at 665. Dr. Holzer prescribed hydromorphone, another opiate, for breakthrough pain. *Id.* At the conclusion of the July 18, 2012 appointment, Dr. Holzer discussed with Ms. Murphy that despite extensive testing, a clear diagnosis for her complaints was potentially impossible. *Id.*

Following the July 18, 2012, appointment, Dr. Holzer ordered a repeat MRI of Ms. Murphy's cervical and lumbar spines. *Id.* at 666. The scan of her lumbar spine revealed overall mild degenerative disc disease with a mild disc bulge at L4-5 and a mild disc protrusion at L5-S1. *Id.* at 653, 662. Dr. Holzer also ordered a DXA bone densitometry test, which proved unremarkable. *Id.* at 944-46.

On July 27, 2012, Ms. Murphy presented to Western Branch Family Practice in Chesapeake, Virginia, with complaints of leg swelling and a pain rate of "10/10." *Id.* at 573-74. In a progress note, Barbara Schimming, N.P. ("N.P. Schimming") noted that Ms. Murphy "was asking for pain medications from Patient First," and that because she is in pain management, these are "drug seeking behaviors." *Id.* at 574. Further, Ms. Murphy "was advised that physicians or health care providers do not go through a patient to give orders to another health

care provider." *Id.* Ms. Murphy became upset as a result of N.P. Schimming's statement.

On July 31, 2012, Dr. Jackson filled out a Medical Source Statement of Ability to Do Work-Related Activities (Physical) regarding Ms. Murphy. *Id.* at 585. Dr. Jackson opined that Ms. Murphy could both lift and carry, occasionally, up to fifty pounds, and frequently, up to twenty pounds. *Id.* Dr. Jackson opined that Ms. Murphy could sit, stand, and walk, between thirty minutes and one hour at a time without interruption in an eight-hour work day. *Id.* at 586. Dr. Jackson opined that Ms. Murphy could continuously reach, handle, finger, and feel, that she could frequently push and pull, and that she could occasionally reach overhead, *id.* at 587, but that she could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl, *id.* at 588.   Dr. Jackson noted throughout the Statement that Ms. Murphy had continued cervical spine pain. *Id.* at 585, 587, 590.

On September 17, 2012, Ms. Murphy presented to the Center for Pain Management for follow-up instructions on "chronic severe pain which is widespread and is attributed to multiple underlying medical comorbidities." *Id.* at 653. Ms. Murphy advised P.A. McCrary that she was taking old hydrocodone during her strep throat infection. *Id.* It was noted in P.A. McCrary's progress note that Ms. Murphy recently received prescriptions for Vicodin and Percocet for ear infections, and that she was on hydromorphone, a third pain narcotic, as well. *Id.* Further, it appears that each visit to the Center for Pain Management, Ms. Murphy would provide a "very long letter" with multiple complaints and concerns, but that the Center wanted her to focus on a couple of chief complaints. *Id.* at 778.  She also appeared to frequently cry during her exams about her health and was smoking about one pack per day of cigarettes. *Id.*

On October 2, 2012, Ms. Murphy returned to see Dr. Kerner at VOSS for complaints of pain. *Id.* at 814.    An MRI of her cervical spine was "essentially normal[, with] . . . minor

degenerative chances, but subtle and normal for her age.  There is no focal stenosis or instability or any ostensibly objective anatomic pathology of significance." *Id.*  Dr. Kerner indicated that Ms. Murphy has "myofascial pain syndrome or fibromyalgia," but that there is no surgical solution for her pain as there is no one anatomic pathology that surgery could address. *Id.* at 815.  Further, Dr. Kerner stated that Ms. Murphy's depression is significant and affects her ability to deal with pain, and that he did "not believe there is any true anatomic pathology present that one could directly relate to any of her complaints in any meaningful way." *Id.*

On July 26, 2013, Ms. Murphy presented to the Internists of Churchland for a follow-up. *Id.* at 837.  Ms. Murphy requested Percocet "to cover her at night." *Id.*  She mentioned that she was having some neck and ear pain, and thought she had an ear infection. *Id.*  Regarding the Percocet request, the treating physician noted, "She claims to have discussed this w[ith] pain clinic and that it's ok if we give her a script to cover her until the next visit in 6 days or so." *Id.*

On September 7, 2013, Ms. Murphy presented to the Internists of Churchland with complaints of sinus pressure, tooth pain, and ear discomfort. *Id.* at 832.  A progress note for this visit—filled out by Dr. Raymond S. Dumaran, M.D. ("Dr. Dumaran") indicated, "In passing [Ms. Murphy] asked for Vicodin refill and [was] refused." *Id.*

On November 19, 2013, a progress note from the Center for Pain Management indicated that Ms. Murphy had returned for a follow-up of "chronic, severe pain, which is generalized and widespread and has been attributed to fibromyalgia." *Id.* at 760.

On November 22, 2013, Ms. Murphy presented to Maryview Medical Center with complaints of abdominal pain, lower back pain, and urinary frequency. *Id.* at 1003.  Ms. Murphy stated that "she has run out of her pain meds from Dr. Holzer – Dilaudid 8 mg for breakthrough and Oxycodone 30 mg for basal." *Id.*  An exam reported "no distention and no mass . . . no

impaction in the rectal vault," but did reveal "two non thrombosed [sic] external hemorrhoids." *Id.* at 1006. The treating physician prescribed Oxycodone 15 mg, which Ms. Murphy agreed to but then "tr[ied] to ask for more pain meds, which [the physician] refused." *Id.*

Three days later, on November 26, 2013, Ms. Murphy presented to Maryview Medical Center for chronic pain, anxiety, a panic attack, acid reflux, and nausea. *Id.* at 1015. Ms. Murphy stated that she took pain medications the prior day but admits to being discharged from pain management. *Id.* Her family stated to the physician that Ms. Murphy was under a lot of stress, depressed, and that they asked for Ms. Murphy to get a psyche evaluation. *Id.* A physical exam of Ms. Murphy's symptoms found Ms. Murphy negative for all eye, respiratory, cardiovascular, genitourinary, musculoskeletal, skin, and neurological symptoms, but did find her positive for nausea and constipation with a nervous and anxious mood. *Id.* Ms. Murphy was admitted to the Maryview Medical Center – Psychiatric Unit voluntarily, with the basis for admission stated as, "Opiate detox." *Id.* at 1037. Ms. Murphy initially expressed hesitation about admission into the Unit but her "family [was] adamant that she get in so that she could be detoxed." *Id.* Ms. Murphy reported "that she no longer wants to be dependent on her pain medications. She acknowledges that [she] had been recently dismissed form the Pain Management Clinic at Bon Secours because it was felt that she was misusing or overusing pain medications." *Id.* Ms. Murphy further acknowledged that her "husband has oftentimes been quite exasperated by [Ms. Murphy's] many health problems and he feels that perhaps she exaggerating [sic] some of these." *Id.* at 1038. Further regarding her opiate prescriptions, Ms. Murphy stated that "on many occasions, she has taken more than she should have . . . abusing them. She has gone to many emergency rooms in order to obtain pain medications." *Id.* at 1039. Ms. Murphy was put on a treatment plan to address her opioid withdrawals, and would be treated

13

symptomatically for the aches and pains. *Id.* at 1040.

### III. THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for the Acting Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Acting Commissioner is supported by substantial evidence in the record. *Id.* The ALJ must determine if "(1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment." *Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law:  First, the ALJ found that Ms. Murphy did not engage in substantial gainful activity since October 9, 2011, the alleged onset date of disability.  R. 15.  Second, Ms. Murphy had the following severe impairments:  Degenerative disc disease, depression, anxiety, and arthritis.  *Id.* (citing 20 C.F.R. § 404.1520(c)).  Third, Ms. Murphy did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* at 16.  The ALJ assessed the severe impairments under multiple listings, such as disorders of the spine (listing 1.04(A)), major dysfunction of a joint (listing 1.02), and mental impairments (listings 12.04 and 12.06).  *Id.* Fourth, the ALJ found that Ms. Murphy had the RFC to perform sedentary work as defined by 20 C.F.R. § 404.1567(a) with the following limitations:  Ms. Murphy is unable to climb, or engage in work overhead, she can occasionally stoop or squat but not crawl, and she is limited to simple, routine tasks.  *Id.* at 18.  Fifth, while Ms. Murphy is unable to perform past relevant work, the ALJ found that considering her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Ms. Murphy can perform.  *Id.* at 20-21. The ALJ, relying on the VE's opinion, found that suitable jobs exist, including surveillance system monitor, cashier,[2] and hand packer.  *Id.* at 21.  Therefore, the ALJ determined that Ms. Murphy had not been under a disability from October 9, 2011, through June 30, 2012.  *Id.* at 22.

## IV.  STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Acting Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in

---

[2] The VE testified that the Dictionary of Occupational Titles classifies "cashier" as sedentary work; however the VE seemed to dispute the classification of cashier as sedentary work, but did state that, from personal experience, there are sedentary cashier positions available in the national economy.  R. 68.

the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Acting Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Acting Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

### A. The ALJ Properly Considered the Testimony of Michael Murphy.

In her first claim of error, Ms. Murphy argued that the ALJ failed to properly analyze the testimony of her husband, lay witness Michael Murphy. ECF No. 13 at 5. Ms. Murphy cited *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir.2001) and *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006), for the proposition that the ALJ is required to account for all lay witness testimony in the discussion of his or her findings. *Id.* at 5-6. In response, the Commissioner argued that when the lay witness's testimony is cumulative or duplicative of other testimony of record, the ALJ is not required to provide specific reasons for rejecting such testimony. ECF No.

16

15 at 16-17. The Commissioner further argued that an ALJ's failure to properly address lay witness testimony does not warrant remand if the substance of the testimony would not have changed the outcome of the case. *Id.* at 17.

Mr. Murphy testified at the hearing in front of the ALJ on December 10, 2013. R. 62. The following is a summary of Mr. Murphy's testimony on three topics for which he testified:

> 1) Ms. Murphy's hospitalization at Maryview Medical Center: Ms. Murphy was under the care of Pain Management and stated the following: "[Pain Management] had her on some heavy doses of pain medicine. [The medicine] ran short and she had a panic attack. And so we carried her to the hospital to see what they could do on getting her – well, what was going on. At the same time they had found she was impacted, within her intestines, with her bowels and problems." Ms. Murphy takes Naproxen, Neurontin, blood pressure, Cymbalta, trazadone, and one other medication that Mr. Murphy could not remember. Mr. Murphy tracks Ms. Murphy's medication.

> 2) A typical day for Ms. Murphy: Ms. Murphy's oldest son wakes Ms. Murphy up in the morning. Ms. Murphy then drives him half a mile to school and returns home. Ms. Murphy then returns to bed until her son is ready to be picked up from school. Ms. Murphy spends, at minimum, the "good part of the day" in bed. Ms. Murphy has panic attacks and crying spells two-to-three times per day. Other than driving their son to and from school, and visiting her father on holidays, Ms. Murphy generally does not leave the house.

> 3) A typical day for Mr. Murphy: Mr. Murphy generally wakes his older son up in the morning on school days before he leaves for work. When Mr. Murphy gets home, he makes dinner for the family. In addition, Mr. Murphy does all the grocery shopping, lifting, pulling, laundry, and vacuuming. Finally, Mr. Murphy helps Ms. Murphy keep track of her medication.

*Id.* at 62-66. The ALJ addressed Mr. Murphy's testimony in only one paragraph of the ALJ's opinion, and only in regard to Ms. Murphy's activities of daily living: "The claimant's husband, Michael Murphy, similarly testifies that he goes to the grocery store, launders clothing, and does all the necessary pushing and pulling in the home." *Id.* at 17.

In the case Ms. Murphy cited, *Robbins*, the Ninth Circuit Court of Appeals found that the ALJ erred in assessing the testimonial evidence by failing to properly account for the testimony of the claimant's son. 466 F.3d at 885. The court found this error was not merely harmless, and

thus ordered remand. *Id.* While this Court is not obligated to follow Ninth Circuit precedent, the Court will address the *Robbins* case in light of Mr. Murphy's argument and the Fourth Circuit's past recitation of the same issue. *See Morgan v. Barnhart*, 142 F. App'x 716, 731 (4th Cir. 2005) (citing a few Ninth Circuit cases and discussing the importance of family members' observations of a claimant's medical impairments). The general holding of *Robbins* appears to support Ms. Murphy's argument; the rules therein support the Commissioner's argument. First, the ALJ in *Robbins* failed to even mention the son's testimony, which "add[ed] substantial weight not only to [the claimant's] claim, but also to the testimony of [the claimant's] wife and daughter, which support [the claimant's] claim." *Id.* The *Robbins* court relied on *Stout v. Comm'r,* 454 F.3d 1050, 1055-56 (9th Cir. 2006), another Ninth Circuit case, which held that "where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Id.* The *Robbins* court continued, "Because the ALJ did not make a legally sufficient adverse credibility finding with regard to Robbins's own testimony, we cannot say with respect to [his son's] testimony that 'no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.'" *Id.; see also Morgan*, 142 F. App'x at 731 (citing *Behymer v. Apfel,* 45 F.Supp.2d 654, 663 (N.D. Ind. Mar. 11, 1999) ("Descriptions of friends and family members who were in a position to observe the claimant's symptoms and daily activities have been routinely accepted as competent evidence. . . . When an ALJ fails to believe lay testimony about a claimant's allegations of pain or other symptoms, he should discuss the testimony specifically and make explicit credibility determinations.")).

Unlike the ALJ in *Robbins*, the ALJ here made a legally sufficient credibility finding as to Ms. Murphy's testimony. R. 18.

> [Ms. Murphy's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in the decision. The undersigned does not find that Ms. Murphy is fully credible due to many references and situations strongly indicating drug-seeking behavior. She acknowledged that in November 2013 that [sic] she took more pain medications than she should have and she talks about "abusing them." Treating physician Dr. Faisal Mohsin notes that the claimant has visited many emergency rooms to obtain these drugs. It follows that she was discharged from a pain management program for medication over-use, and she is diagnosed with Substance Abuse.

*Id.* The ALJ then compared Ms. Murphy's subjective complaints with her medical records, noting some of her physical exams that appeared normal or unremarkable, noting that she alleged pain in December of 2011 with little relief with the medications she was prescribed, but that she did not wish to change them, and noting a report in October of 2012 from Dr. Kerner that stated, "I do not believe there is any true anatomic pathology present that one could directly relate to any of her complaints in any meaningful way." *Id.* at 18-19. The ALJ here clearly found Ms. Murphy's testimony regarding her alleged symptoms as not fully credible. Mr. Murphy's testimony, *supra*, merely echoed Ms. Murphy's testimony, and thus would not be supported by the objective medical evidence in the record.

Furthermore, as the Commissioner argued, "where . . . lay witness testimony is merely cumulative or duplicative of other testimony of record, the ALJ is not required to provide specific reasons for rejecting such testimony." ECF No. 15 at 17. Further, "an ALJ is not required to discuss lay witness testimony when it "does little more than corroborate a plaintiff's own testimony." *Stanley v. Colvin*, No. 7:12-CV-134-FL, 2013 WL 2447850, at *9 (E.D.N.C. June 5, 2013) (citing *Grubby v. Astrue,* 2010 WL 5553677, * 7 (W.D.N.C. Nov. 18, 2010)). In *Lee v. Astrue*, a case similar to Ms. Murphy's, the plaintiff argued "that the ALJ erred by citing

to and discounting some of the testimony of her husband, Thomas Lee, without making findings regarding his credibility." No. CA 1:10-2837-MBS-SVH, 2011 WL 7561514, at *12 (D.S.C. Dec. 21, 2011), *report and recommendation adopted,* No. CA 1:10-2837, 2012 WL 931974 (D.S.C. Mar. 16, 2012). The ALJ considered the husband's testimony about the plaintiff's pain, and that he took care of the children and did the grocery shopping. *Id.* The court found no error in the ALJ's recitation of this issue, "Because the ALJ properly considered Plaintiff's credibility and properly determined she was not fully credible, Plaintiff [did] not show[] harm from the ALJ's failure to make a specific finding regarding the credibility of her husband's lay witness testimony." *Id.* at *13. The court further discussed "the goal of SSA regulations concerning lay witness testimony," finding that the ALJ met that goal "by discussing the same impairments and symptoms attested to by the lay witness." *Id.* "The essential purpose of requiring ALJ's to address the testimony of each lay witness is to ensure a thorough consideration of the effects of Plaintiff's impairments on her ability to work." *Id.* The court concluded, finding no error when not specifically analyzing the husband's credibility so long as "the ALJ discussed the impairments and symptoms attested to by Plaintiff and her husband." *Id.*

Ms. Murphy argued that the ALJ erred by only considering Mr. Murphy's household duties, thereby failing to account for Mr. Murphy's testimony about Ms. Murphy's alleged symptoms and medical impairments. But the ALJ here addressed Ms. Murphy's testimony, finding her alleged impairments incongruous with the objective medical records, and concluding that her testimony was not fully credible. As the court noted in *Lee*, the ALJ commits no error so long as the ALJ discusses the impairments and symptoms attested to by the claimant and the lay witness. Because Mr. Murphy's testimony merely echoed Ms. Murphy's incredible testimony, the ALJ committed no error by not analyzing Mr. Murphy's testimony in more detail. *See Goad*

*v. Astrue*, No. CIV.A. 1:06-00870, 2008 WL 644881, at *1 (S.D.W. Va. Mar. 7, 2008) ("[S]everal courts have held that the listing of specific reasons for dismissing the testimony of a lay witness is not necessary when the lay witness's testimony merely repeats the claimant's allegations which were discredited, and/or the lay witness's testimony is contradicted by the same objective evidence discrediting the claimant's testimony."); *James v. Astrue*, No. CIV.A. 3:11-635-CMC, 2012 WL 3877695, at *10 (D.S.C. Aug. 16, 2012), *report and recommendation adopted,* No. CA 3:11-635-CMC-JRM, 2012 WL 3877687 (D.S.C. Sept. 5, 2012) ("Where a lay witness's testimony merely repeats the allegations of a plaintiff's own testimony and is likewise contradicted by the same objective evidence discrediting the plaintiff's testimony, specific reasons are not necessary for dismissing the lay witness's testimony. "); *Cordell v. Barnhart*, 1:05CV281, 2006 WL 5435534, at *3-4 (W.D.N.C. May 19, 2006) (same); *Whiting v. Colvin*, No. 3:13CV393 DJN, 2014 WL 2434591, at *11 (E.D. Va. May 29, 2014) (finding no error when "[t]he ALJ found the third party lay witness testimony not to be credible to the extent that Plaintiff is incapable of all work, because their statements were inconsistent with the medical records and Plaintiff's functioning").

**B.   The ALJ's Determination of Ms. Murphy's Severe Impairments is Supported by Substantial Evidence in the Record.**

In her second claim of error, Ms. Murphy argued that the ALJ failed to find that her conditions of chronic pain/myofascial pain, brachial neuritis or radiculitis (inflamed nerves in shoulders/arms), not otherwise specified, myalgia and myositis (muscle pain and inflammation), unspecified, cervicalgia (neck pain) and lumbago (lower back pain) were severe impairments. ECF No. 13 at 6.   Specifically, Ms. Murphy referred to the fact that the above-listed alleged impairments were the result of diagnoses made by medical professionals, and that Ms. Murphy's

subjective complaints regarding those diagnoses more than satisfied the severe impairment "de minimus" threshold. *Id.* at 8-9. The Commissioner responded, arguing first that with regard to Ms. Murphy's complaints of chronic pain, that "pain is merely a symptom. . . . Without more, pain is not enough to establish that a severe impairment exists," and that Ms. Murphy did not meet her burden in proving that her pain was a stand-alone impairment. ECF No. 15 at 20. Second, the Commissioner argued that the ALJ's decision that the above-listed impairments were not severe impairments was supported by substantial evidence in the record because the objective medical evidence demonstrates that those impairments did not inhibit her functional capacity to perform work-related activities. *Id.* at 20-21.

At step two of the sequential evaluation process, the ALJ is tasked with determining whether a claimant has any severe impairments, 20 C.F.R. § 404.1520(c), but it is the claimant's burden to prove her impairments are severe, *see Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992), *as amended* (May 5, 1993). A severe impairment is defined as one that "significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996). "An impairment is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521. The ability to do "basic work activities" is defined as having the abilities and aptitudes to do most jobs. *Id.* If the claimant has no severe impairment(s), the disability evaluation process ends at step two. *Id.* § 404.1520(c). If the claimant is found to have a severe impairment, the process continues on to the next steps. *Id.* § 404.1520(d)-(f).

Each of the impairments that Ms. Murphy alleges are severe relate to pain. "[F]or pain to be found to be disabling, there *must* be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but

22

*the pain the claimant alleges she suffers.* The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment 'which could reasonably be expected to produce' the actual pain, in the amount and degree, alleged by the claimant." *Mickles v. Shalala*, 29 F.3d 918, 926 (4th Cir. 1994) (citing 20 C.F.R. § 416.929(b)) (emphasis in original). The determining question though, is whether the claimant's pain inhibits her ability to work. *See* 20 C.F.R. § 404.1529(c)(1) (explaining that when evaluating a claimant's complaints of pain, the ALJ must consider the intensity and persistence of the pain to determine how the pain, like all other symptoms, limits a claimant's capacity for work).

Ms. Murphy pointed to her diagnoses of chronic pain by Dr. Holzer in 2011 and Dr. Jackson in 2012. ECF No. 13 at 7. Ms. Murphy then pointed to her testimony, indicating that her subjective complaints support her doctors' diagnoses. *Id.* Lastly, Ms. Murphy pointed to evidence in her medical records, demonstrating that in January and May of 2011 she had an MRI that showed marrow edema, that she may have some sort of unusual inflammatory disease, and that she was given four trigger point injections on the left trapezius and one on the right. *Id.* at 7-8. Each of these arguments, both alone and considered together, are unpersuasive as the substantial weight of the evidence indicates that Ms. Murphy's pain did not limit her ability to work.

First, "[t]he mere presence of a disease or medically determinable impairment does not automatically entitle a claimant to a disability period or disability insurance benefits under the Social Security Act." *Gotshaw v. Ribicoff*, 307 F.2d 840, 844 (4th Cir. 1962). Disability is not determined by mere diagnosis, but by functional limitations caused by medically determinable impairments. 20 C.F.R. § 404.1521; *see Gadbois v. Colvin*, No. 2:15-CV-107, 2015 WL 10323034, at *8 (E.D. Va. Dec. 28, 2015), *report and recommendation adopted*, No.

2:15CV107, 2016 WL 715724 (E.D. Va. Feb. 17, 2016) (finding that the mere diagnosis of POTS did not demonstrate anything about [the claimant's] condition and ability to work on or before the date of the Commissioner's determination); *cf. Fagg v. Charter*, 106 F.3d 390, 1997 WL 39146, *1-*2 (4th Cir. 1997) (unpublished decision) (holding that evidence was not material because it did not indicate that the claimant was disabled or limited by the impairment during the relevant period under consideration by the ALJ).

Second, Ms. Murphy's testimony regarding her pain was not only found to be not fully credible, but is unsupported by the objective medical evidence. "[S]tatements about [a claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled; there must be medical signs and laboratory findings which show that [a claimant has] a medical impairment[] which could reasonably be expected to produce the pain or other symptoms alleged and . . . would lead to a conclusion that [the claimant is] disabled." 20 C.F.R. § 404.1529(a). The objective medical evidence does not support Ms. Murphy's complaints that these impairments are severe. All of the impairments that Ms. Murphy alleged the ALJ failed to find as severe relate to pain: Chronic pain/myofascial pain, brachial neuritis or radiculitis (inflamed nerves in shoulders/arms), not otherwise specified, myalgia and myositis (muscle pain and inflammation), unspecified, cervicalgia (neck pain) and lumbago (lower back pain). In May of 2010, Ms. Murphy complained of lower back pain with right sciatica, the MRI revealed some disc protrusion but showed no stenosis, or narrowing of the open space in the spine. R. 561. In July of 2010, Ms. Murphy was diagnosed with chronic pain due to ongoing pain in her left foot after stepping in glass, depression with anxiety, chronic pain in her back, both hips, and shoulders, and elevated blood pressure. *Id.* at 602.

In October of 2010, another MRI of her cervical spine identified no disc herniation,

stenosis, or abnormal enhancement of the spinal cord. *Id.* at 372. In May and June of 2011, Ms. Murphy presented to Dr. Kerner, complaining of a snapping sensation in her neck, leaving her with severe neck and radiating left arm pain with a burning numbness in her left arm. *Id.* at 557. Dr. Kerner assessed an MRI, a CAT scan, and bone scan of Ms. Murphy's neck, concluding both to be benign and did not believe that there was any "true" bony pathology in Ms. Murphy's neck. *Id.* at 558. Dr. Kerner advised that there was "nothing with regards to [Ms. Murphy's] cervical spine . . . that explains her symptomatology." *Id.* at 555. In October of 2011, Ms. Murphy complained that she was experiencing the worst pain ever, and that her Oxycodone prescription was losing its efficacy. *Id.* at 415-20. She was then prescribed Hydromorphone, but then reported two months later that she was taking up to five Oxycodone per day. *Id.* at 410-11. P.A. McCrary noted the large quantity of medication Ms. Murphy was taking and refused to increase Ms. Murphy's request for more prescription medication. *Id.* at 403. In January of 2012, Ms. Murphy presented to the Center for Pain Management, complaining of back pain, right leg pain, and left arm pain, but had a normal range of motion. *Id.* at 395-96. Again, she requested an increase in her regimen of Oxycodone, Sonata, and Klonopin. *Id.* at 396. Ms. Murphy followed up with P.A. McCrary on January 25, 2012, complaining of generalized body aches. *Id.* at 388-94. On examination, Ms. Murphy had decreased left arm strength. *Id.* at 388. She reported only 20% pain relief with the same medication regimen but wanted to keep it in place. *Id.* In May of 2012, Ms. Murphy saw Dr. Jackson for trigger point injections and requested additional pain medication, which he refused to prescribe since she was only to receive her medication from the Center for Pain Management. *Id.* at 816. Ms. Murphy received another MRI in July of 2012, which ultimately revealed the same mild degenerative disc disease that her four previous MRI's revealed, *id.* at 653-62, and received a DXA bone densitometry test, which proved unremarkable,

*id.* at 944-46.

Ultimately, the evidence in Ms. Murphy's medical record demonstrates a pattern: Ms. Murphy presents to a treating medical professional with complaints of pain, ranging all over her body, including her feet, knees, hips, lower back, neck, arms, and shoulders. Testing through MRIs, CAT scans, bone scans, bone densitometry tests, and physical range of motion tests all reveal unremarkable or normal results, or very mild physical impairments that would not cause the pain or the intensity of the pain for which Ms. Murphy complains. She is then prescribed pain medication, which she alleged provided minimum relief, but she declined to try other treatment methods and continually sought increases in her doses or prescriptions for opioid-based pain relief. In November of 2013, Ms. Murphy was admitted to the Maryview Psychiatric Unit to detox from the opioids. *Id.* at 1037. Her current treatment no longer includes anything that she could get addicted to. *Id.* at 46. Dr. Kerner indicated that her pain lacked any pathological foundation. *Id.* at 555, 558, 815. Accordingly, Ms. Murphy points to no medically determinable impairment supported by evidence in the record that could reasonably be expected to cause the pain she allegedly suffers. *See Mickles*, 29 F.3d at 926. Additionally, there is no evidence that Ms. Murphy's unexplained pain affects her ability to work. On July 31, 2012, Dr. Jackson filled out a Medical Source Statement, opining that Ms. Murphy could both lift and carry, occasionally, up to fifty pounds, and frequently, up to twenty pounds, and that she could sit, stand, and walk, between thirty minutes and one hour at a time without interruption in an eight-hour work day. *Id.* at 585-86. Dr. Jackson also opined that Ms. Murphy could continuously reach, handle, finger, and feel, that she could frequently push and pull, and that she could occasionally reach overhead, *id.* at 587, but that she could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl, *id.* at 588. *See Baez v. Colvin*, No. 2:14-CV-00628, 2015 WL

9652888, at *15-16 (E.D. Va. Dec. 7, 2015), *report and recommendation adopted,* No. 2:14CV628, 2016 WL 69900 (E.D. Va. Jan. 5, 2016) (affirming the ALJ's decision that the claimant's sleep apnea and migraines were not severe impairment because there was no evidence that his sleep apnea and headaches affected his ability to do basic work activities); *Bennett v. Colvin,* No. 2:13CV189, 2014 WL 1603737, at *11 (E.D. Va. Apr. 21, 2014) (noting that the record does demonstrate symptoms resulting from the claimant's diabetes, such as numbness and episodes of hypoglycemia, but that "there is scant evidence of any functional limitations associated with these symptoms" and thus finding no error in the ALJ's designation of the claimant's diabetes as not severe).

Even assuming Ms. Murphy's alleged impairments were incorrectly labeled as non-severe, such an error ultimately would be harmless. Ms. Murphy's other conditions, namely degenerative disc disease, depression anxiety and arthritis, were all deemed to be severe by the ALJ. R. 15. The evaluation process proceeded past step two based on these severe impairments. R. 15-18. Therefore, the designation of chronic pain/myofascial pain, brachial neuritis or radiculitis, not otherwise specified, myalgia and myositis, unspecified, cervicalgia and lumbago as non-severe did not halt the evaluation process at step two. Once a claimant moves beyond step two, the ALJ is required to consider the combined effects of all of the claimant's impairments, severe and non-severe, throughout the remaining steps of the evaluation process. 20 C.F.R. § 404.1523; *Cook ex rel. v. Colvin,* No. 2:11–cv–362, 2013 WL 1288156 (E.D. Va. Mar. 1, 2013). This Court has previously held an ALJ's failure to label an impairment as severe at step two to be harmless error as long as the ALJ discussed the evidence related to the impairment at subsequent steps in the evaluation process. *Id.* The ALJ in this case satisfied this requirement by referring to each of these alleged impairments in the subsequent analysis

27

following step two. *See, e.g.*, R. 18 (discussing Ms. Murphy's pain medication use and her credibility regarding the intensity and persistence thereof); *id.* at 19 (noting that medical reports from October 2013 indicate no pain in the back is present and that all four extremities are normal); *id.* (noting there is also some evidence of cervical degenerative disc disease, mild disc osteophyte complex with facet athropathy, and mild left neural foraminal narrowing but that it is not disabling).   Therefore, even if the ALJ committed error by failing to designate these impairments as severe at step two, his subsequent analysis of the symptoms these impairments cause renders such error harmless.

In sum, the ALJ's designations of Ms. Murphy's chronic pain/myofascial pain, brachial neuritis or radiculitis, not otherwise specified, myalgia and myositis, unspecified, cervicalgia and lumbago as non-severe is supported by substantial evidence in the record, and further, the record lacks evidence of any significant functional limitations associated with these impairments. Therefore, the Court would affirm the decision of the Acting Commissioner on this claim.

## VI. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Ms. Murphy's Motion for Summary Judgment, ECF No. 12, be **DENIED,** the Defendant's Motion for Summary Judgment, ECF No. 14, be **GRANTED,** the final decision of the Acting Commissioner be **AFFIRMED,** and that this matter be **DISMISSED WITH PREJUDICE.**

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
June 22, 2016